Did counsel bring any samples for us? No. We did not, Your Honor. Okay. Good morning, Your Honors. My name is Colin Hawley. I'm with the law firm Watt, Teeter, Hoffer & Fitzgerald, LLP, representing Appellant JL Beverage, LLC. May it please the Court. Your Honors, first I'd like to reserve five minutes of my time for rebuttal. I'd like to focus initially on the errors of law the district court made in assessing the sleek craft factors applicable to a determination of likelihood of consumer confusion. And the first error of law I'd like to talk about, Your Honors, is the error with respect to the similarity factor. And here the district court erred in not following the aspect of that law that says similarities in the party's use of the marks must be weighed more heavily than the differences. That test is a bit nebulous. I understand that. But there is guidance that this Court can look at, in particular recent decisions of this Court that apply to use of marks on beverages. One of those cases is the Palm Wonderful, LLC v. Hubbard case. That's in our papers. It's 775 Fed 3, 118, 9th Circuit, 2014. And I would ask the Court really to take a close look at that case, and the images and the opinion in that case are very instructive and illustrative in terms of what the guideposts are in terms of weighing similarities more heavily than differences. In the Palm Wonderful case, the marks at issue were both the term Palm, P-O-M, and the use of that mark in connection with pomegranate-flavored beverages. And if you look at the images and the opinion, one of the parties uses that mark in connection with a bottle shape that is very hourglass-shaped. It's incredibly distinctive. The other product is a can that has the mark on it as well, but fairly small. It has a bigger word, pure, in it. It's got branding of the company that sells it. So if you looked at those two products in that case, it's quite easy to tell that it's not the same product. However, the Court focused more heavily, as it was required to do, on the similarities, and in particular that word Palm that both companies were using as a brand identifier. And the Court ultimately found that there was similarity that favored a likelihood of confusion in the Palm case. More recently than that case, Your Honor, we have the prior appeal in this case. So we have an opinion of this Court, and Judge Wallace was part of that panel. And the Court gave guidance when it remanded on a number of points, one of which was this similarity point. And the panel, when it sent it back down, in the opinion, specifically discussed the similarities between the use of the lips by the two parties in this case. And we've quoted in our papers exactly what this Court said. But among other things, the Court pointed out that there are numerous similarities in the appearance. Both have puckered human lips as the focal point of their design. The lips have a similar angle and shape. And, critically, the lips are color-coordinated with the flavor of the vodka. So we have a very deferential standard of review here. So, I mean, even if we agree with you that the District Court didn't give enough weight to how similar these lips are, there are still other differences in the bottles, and there are other factors in the test. So it's hard to see how – I mean, do you think if we disagree with one piece of the multifactor test, we have to remand? Your Honor, I think you have to look at all the errors the Court made. We've pointed out three different legal errors the Court made in applying the sleek craft factors. But I do think that that error alone would be enough to change the way that the likelihood of confusion test is determined. And, frankly, if you go back to the Palm case, Your Honors, in the Palm case, the Ninth Circuit, this Court, determined that the likelihood of confusion test should have ruled – basically reversed and held that that test should have been determined the other way. That was in connection with the motion for preliminary injunction. And the Court did not remand back to the Court to, you know, redo the test. The Court said, no, when you apply the factors correctly using the correct law, there should have been a finding of likelihood of confusion. And that's what I do believe should happen here. If we're talking about the similarity test, this isn't, in my view, a close call as to whether the District Court applied the test correctly or not and maybe gave a little bit more weight to differences than similarities. I think it would be hard to come up with a stronger example of a court applying a granular, deconstructionist type of analysis to the marks. I mean, here we're talking about the lips, the stylized lips with the colors that track the flavor of the vodka. This court went to the extent of saying, well, if you count the creases in the lips, one of the marks has more creases than the other. And that's the epitome of a deconstructionist view of these marks. And that's not what the Court is supposed to do. And, again, Your Honor, I think this Court gave the District Court guidance when it sent it back down. And the District Court just flat out went the other way and focused entirely on differences and didn't mention at all similarities that this Court had already pointed out in a prior appeal. But, again, Your Honor, it's not the only factor. It's not the only error of law the Court made. The Court also made an error with respect to the intent factor and also the strength factor. I'd like to discuss the intent factor next. And here the error is stark, Your Honors. The Court focused, when it discussed the intent factor, on what it found to be the good faith of Beam in selecting initially this mark as what it was going to brand its product with. And we're not talking about what Beam did after it found out that there was another mark being used in commerce that was similar. The Court was focusing on, okay, when they started looking at what they were going to do in terms of branding, they acted in good faith in coming up with this design. But that's absolutely not the test. As this Court held in ruling on the prior appeal, the intent factor, quote, favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark. And that's this Court's prior appeal, 828 Fed 3rd at 11-11 to 11-12. So the question for a defendant, Your Honor, is really what did you do after you knew? Did you, the defendant, still go to market using the trademark after learning that another company – So wasn't part of the – maybe I misunderstood this, but I thought part of the district court's good faith idea was they knew about the mark but thought they weren't infringing. I believe the Court did say that, Your Honor. However, again, that's not the test. It's not a subjective test on whether a party knew it was infringing. And the reason for that is trademark law is not intended ultimately to protect the parties, the people selling the products. It's intended to protect consumers. So the question is, at a time when you know that there's another company using a similar mark and you have actual or constructive knowledge of that, did you go forward and roll out the product anyway or did you not? And that really, for the purposes of this context, is the question. Because you're trying to protect the consumer. Right, but the good faith question for the consumer would be, do we think consumers are going to be confused? And I thought what the district court was saying was they didn't think that consumers would be confused. Ultimately, I think in saying that, the Court was conflating the intent question with the similarity question. Because when you're talking, again, about similarity with intent, especially when we have a reverse confusion claim as well, you're only looking at the point where the defendant learns, has actual or constructive knowledge of another using a mark that's arguably similar. What did they do? And this goes back to – Do you think that there's inconsistency in our case law on that? I mean, it seems like there are a lot of cases that have knowledge of the other mark and yet don't find liability. I think ultimately that comes down to that it's a multi-factor test and case law is clear that ultimately you don't have a structured counting of X factors for X factors against finding likelihood of confusion. So courts do kind of look at some issues that seem to blur, I would say. But what we're talking about here is the court really relied heavily on intent and similarity to find against jail beverage and the Johnny Love Vodka product being confusing. And it clearly applied the wrong law because, again, I go back to – On the reverse confusion theory, there wasn't much time where both products were on the market, was there? Yes, there was a long time. But in 2011, wasn't it? I mean – No. Okay, explain then. So certainly after 2011, the Johnny Love Vodka product was – because of the Pucker Vodka flooding the market with a very confusing mark, ultimately the owners of the Johnny Love Vodka product decided that they were not generating – this is the whole purpose of reverse confusion being a point of law is that you can't generate any goodwill for yourself when the junior user is huge and has commercial strength to the point where if you try to continue with your product in the market, you're no longer generating goodwill. What was the trajectory of your client's sales, though, leading up to the release? I mean, I had the impression that it was kind of a failing product already. I mean, what did it look like? I mean, were they like all of a sudden going up and then all of a sudden crashing? I didn't think it was like that. No, Your Honor. I would disagree that it was a failing product. They were certainly still in the early stages of what they thought was going to be a multi-decade plan to roll out this product. But they had extensive sales in certain areas. For instance, as we noted in our papers, they were selling on Alaska Airlines. They had sold over a million small bottles over a period of time on that airline. Just consider the number of consumers who were exposed to the product just from that alone. And so on Alaska Airlines in 2011 when the vodka was there, was there also the other vodka? I think it was earlier in time. So they wouldn't have been competing at that period of time. But there were continued sales. Frankly, as we put in our statement of facts, there were sales and marketing efforts all the way through trial of this matter. It seems like those were like special order sales and people who would have definitely known what they were ordering. They were making efforts to go into certain markets. They were focusing on Florida with a particular distributor and things like that. So certainly sales were diminished. But there were clearly periods of time where there was overlap. Your Honor, it looks like I've gone past my rebuttal time of reserve. Thank you. Thank you. Good morning, Your Honors. Excuse me. I'm Edward Colbert. I'm here representing the Beam defendants, both Beam defendants. In the place of court, counsel did not address the issue of the jury trial in his opening statement. I'd like to take a few minutes just to dispose of that, because I think it's readily disposed of before we get into the analysis of the record under the clearly erroneous standard. They do not argue that Judge Due misapplied the precedent of this court in 56 Hope Road. The only argument presented here is that 56 Hope Road was wrongly decided, and it was wrongly decided because of the Dairy Queen case. The Dairy Queen case does not. But it seems like they're saying that 56 Hope is inconsistent with Sid and Marty. Well, let me address it. Sid and Marty Croft. Okay, let's take it between Dairy Queen and 56 Hope Road in 2015, all we have is a Sid and Marty Croft case. The Sid and Marty Croft case is basically on all fours with Dairy Queen. What Dairy Queen stood for in that case was not equitable disgorgement at all. It was a contract case. In fact, to quote the court, in Dairy Queen, the court held the complaint requests money judgment was unquestionably legal. The accounting called for in Dairy Queen was a measure of legal damages. There was a breach of contract which called for payment for this franchise to be based on a set payment plus a percentage of revenue. Therefore, the percentage of revenue was a legal damage claim. I thought Sid and Marty was under a copyright claim. There is a copyright claim, but it's a copyright and a contract claim. In that case, one, I disagree with the position taken by counsel in this case that the fact it's a different regime is not important. It is, but in Sid and Marty Croft, again, it was a contract claim. There was a contract claim between Sid and Marty Croft and the other party to develop a product which became, I think, HR Puff and Stuff. I think my children probably watched it. The description in Sid and Marty is plaintiffs argue on appeal that the district court erred in awarding damages pursuant to 17 U.S.C. 101B. Isn't that the Copyright Act? It is the Copyright Act, but part of it was they claimed the right to the property under contract, and therefore you had to determine what the measures were. And they applied the copyright measure for disgorgement because that was a surrogate for the actual damage, not because it was based on unjust enrichment, but as a surrogate for the actual damages based on the contract claim. So say we disagree with you about that and think we need a basis to distinguish copyright and trademark. Is there one? Trademark rights, well, we have the Lanham Act, and trademark rights arise from common law. It is a common law concept. And the Trademark Act, state and the Lanham Act, incorporate common law principles, incorporate equitable principles. Expressly, right? They actually say as a matter of equity. Yes, expressly. And in copyrights, as with patents, they are a creature exclusively of the United States Constitution. It's the only basis on which they arise. Therefore, they are different regimes. However, let's assume they're not different regimes. The fact that you have a mechanism to determine, and, in fact, Sid and Marty crossed, and in the quotes in the appellate's brief, they say, in that case, the court awarded compensatory damages using this analysis. Not a disgorgement under equity for unjust enrichment, but compensatory damages calculated the following way. And no one has argued, for example, that a jury can't calculate compensatory damages for any reason. Those are legal issues, and they're entitled to a jury. And I would point the court to the fact that between the 62 and 2015 in this court, the only case that's been cited to us is Sid and Marty Croft, the Seventh Circuit case dealing with a breach of contract and copyrights. And, therefore, the case really is very distinguishable because it's much more like Dairy Queen, which is calculating. In Dairy Queen, for example, they had to calculate the revenues, the profits, for purpose of determining what the loss was, the legal loss, the legal claim. Therefore, this decision in this court, in 56 Hope Road, is not wrongly decided. And in terms of what was involved in that case, this court nearly 40 years ago, I guess 30-some years ago, in 1992, held that an equitable disgorgement, not a measure, not a compensatory damages, not a surrogate for damages, but equitable disgorgement for unjust enrichment is clearly exclusively an equitable claim. And we cite that case in Reebok International Limited v. Marntek, 970 Fed Second, 552 at 561, 1992 case. So we're looking back now nearly 30 years. And so from that standpoint, this case is not inconsistent. This case, excuse me, Judge Dew properly applied 56 Hope Road, which was properly decided and not in conflict with Dairy Queen at all, nor in conflict with Sid and Marty Kroft. Now, I'd be happy to, Your Honor has more issues on that, but I'll be happy to address the other ones. One of the things that I hear in this case is that there really is an argument that they believe that the trial court below simply got it wrong. They do not actually challenge Judge Dew's findings. They challenge, they cast her findings in three points under Sleekcraft as having been improper application of the test under Sleekcraft. But let's take a look at that. First one, and Your Honors raised this issue with counsel, they state in their argument that J.L. Beverage manufactures, sells, and promotes a line of flavored and unflavored vodkas called Johnny Love Vodka. That's simply not true as we stand here today. In point of fact, the judge found below, and appellants have not challenged the finding, that all brand activities ceased in 2008, three years before my client launched its product. And, in fact, they can't have any sales. There are no sales after 2011, the year my client launched it. In fact, they sold, the evidence is they sold 112 cases in 2011, and Mr. Diab, the president of the appellant, stated he has no evidence. He ever sold another product after 2011, despite the suggestions that maybe it's potentially possible you could have contacted him and gotten a case. They never made any sales. Therefore, the suggestion that somehow his client's sales fell off because of my client's launch are simply not true. His client had ceased all operations, had stopped sales before my client's launch. Now, the other thing you look at here is in terms of when you're talking about intent. What do you look at in terms of intent? You look at intent at the time of adoption. And what is the test for intent? It is not knowing adoption, as Your Honor pointed out. The test is knowing adoption of a mark, of another, that you believe is similar to that mark. In other words, you have to show both that you knew about the mark. Is that what our court said when it remanded this case last time, though? The court, when it remanded, the applicant, Judge Due, originally had applied a preliminary injunction standard in determining summary judgment, which was clearly not appropriate, and remanded it down for the court to examine various factors. Now, the court didn't direct, for example, that the marks are similar. It said that there are similarities, and you need to look at it. I was addressing intent, but I'll step up there. No, no, but I'm asking about intent. Do you think what the district court said in the order that's being appealed now about intent is consistent with what our court said when it remanded the earlier stage of this case? I believe it is. I believe it is because in applying the intent standard, the judge looked at did you adopt a mark, one, knowing about it, two, believing it to be similar, and doing anyway. And did you do that at the time that you adopted the mark? Not at the time of the launch, but the time of the adoption of the mark. There is not a shred of evidence that they knew about it. The evidence is clear. In fact, the court examined this closely, did not ignore this. They only didn't know about it because they didn't read the letter from the lawyers. I mean, isn't there at least like a recklessness here that is very concerning? No, no, no. The letter from counsel of cease and desist was after the mark was adopted, and there's nothing to require them. Is that? No, no. Not that letter. The review, I mean, so there was a letter when they said are there other, the trademark review analysis that I thought came from their own counsel that said, oh, yeah, there is this other mark, and they didn't read the attachment, so that's how they didn't know about this other brand? No, that's not what occurred, Your Honor. Yes, they do this, and the court examined this. BEAM has a regular process when it adopts any mark. It's a large, very reputable company, and it examines things like the marks, and they examine the marks in their entirety. In this case, they did an analysis. They said, yes, there are lots of marks. In fact, that's not the only mark. As the record will show, there were numerous lips marks in distilled spirits, beers, wines, et cetera, liquids in the marketplace. It's a crowded market. Therefore, when a market's crowded, the similarities have to be greater. You cannot assert a right. There was testimony that when the review came into BEAM that the person who got it didn't notice that this mark was described in the letter, in the document. I believe they relied upon the opinion that said there's nothing conflicting here and did not backstop the lawyers and say, I'll check it myself. So do we have that communication in the record? It's in the record below. Do we have it in the record here? I actually do not know. As I stand here today for record below, it's not cited. It's not addressed in the appellant's brief, so I have not specifically addressed that here. Because it seems like you're saying they were entitled to rely on the statement that there is no infringement, but I don't know that we have a statement that there's no infringement in our record. Well, it may not be in the record because it was not raised on appeal by the appellant. What was in the record below was that, again, looking at this, backing up a minute in terms of intent, we've heard the discussion here from counsel that knowing adoption is all you need. We know that's not the case. The law is not the case. It has to be knowing adoption of a mark which you believe is similar. We don't have that here. Two, the knowing adoption at the time of adoption, no one knew about this. It was cleared later, and when it was launched, they had an opinion that the marks out there were not similar. Therefore, you can't establish bad intent, willful intent, willful infringement. This is what I was getting to before. When our court remanded before, it said absence of malice is no defense. It's not a defense from the standpoint if there's infringement. But it's also not a point saying that you can infer infringement, you can infer intent to infringe. An intent in an infringement analysis is we will infer that you will infringe if you intend to infringe because you're trying to infringe. That's the point. But if you absent malice, no. The fact that you don't intend to infringe, if in fact you infringe, doesn't excuse the infringement. But that's not the point of the analysis here. The analysis here is at the time of the adoption of the mark, and that's a completely different issue. When are you saying is the time of the adoption of the mark? Is it when it started being sold or sometime earlier? It was in 2010 when they started producing the product, before they launched it. Because that, is it clear in the case law that that's the right time to start the question? It is, and we've cited the cases in our brief. The time of the adoption of the mark is when you do it. As opposed to the beginning of sales? Yes. Can you point me to a case that says that? Because I actually did have trouble figuring out that you had support for that. I'll take a look. But the second point is the other issue they raised in their brief was that Mr. Diab, the appellant in this case, had his counsel write a letter to Beam saying stop selling because I have this registration. And that somehow that constitutes intent under the sleek craft factors. Again, it doesn't have anything to do with sleek craft because it's not the time of the adoption. And this gets back to when the time is. But second, the Supreme Court in the patent, if you want to talk about conflating the patent and trademark regimes, in the patent cases, Supreme Court held when they used to have inferences that failing to stop sale because you've got a letter from counsel claiming infringement constitutes a presumption of willfulness. Supreme Court said that's a denial of due process. You cannot force someone to stop doing something simply because the lawyer wrote a letter. Now, in this case, this case was after it was actually being sold. At that point, they got a letter from counsel for the appellant in this case. There's nothing to require them to pull their product off the market. In point of fact, as Judge Dew found, not only was there no – The trademark office also informed you of the other product. The trademark office informed – well, let's back up. There are two marks. There's a JL beverage mark with a Lips as an O for the word love on the label. That was one mark. The second mark that they're talking about was a subsequent application filed by the appellant in this case after my client's adoption and was issued by the trademark office because it was just Lips alone. My client had already abandoned its application to register its entire label, which was extremely difficult, the entire label, because they found out that they used the stock art Lip, and they're not permitted to register that under the terms of the contract with stock art. So they'd already withdrawn it. So it didn't make any difference. Also, the point is – Well, it didn't make a difference to whether the trademark was granted, but it did inform them about the other product and its similarity. No, no. They informed them of the other application, and the determination is they are not similar. The judge found they are not similar. Not only are the products as a whole – and here you need to look at it. From the context of a trademark infringement, you need to look at it in the context of how does the mark appear to the consuming public in the marketplace. And in that case, we have these entirely different-looking products. The judge went through them in detail. Yes, he did go through them in detail. She started from the fact of similarity. They both have Lips. How do you deal with POM? Because POM, they're pretty different-looking products, too. Well, let's start where we got there. In POM, the marks are P-O-M, as counsel pointed out, a word mark. The law is very clear that the analysis is when you have a word mark, like POM, it's a slightly different analysis than when you have a design mark. For example, as Judge Dew found, if you're in a bar or you're in a restaurant, you want to order a drink, you use the name. You say Johnny Love or you say Pucker. You don't say give me something with Lips on it. Therefore, that's why a word mark is a much stronger mark than a design mark, and the law is very clear on that as well. And the judge recognized this. The judge walked through the standards. I'm sorry, my time is up. Okay, you can finish your answer. Okay. And I hadn't addressed some of the other issues like similarity, but the judge walked through them. And one of the things you look in the brief, you'll see that he lined up. He created a display during trial for witnesses to look at and say, can you separate these out? And he even took the caps off so that dissimilarity was no longer present and put a spout on it. Judge first rejected it because he did not believe that's how it was displayed to consumers, but allowed to go forward anyway. And every single witness asked was successfully able to separate every single one of those products apart and never was once confused, although they both had Lips on it, because the products look very, very different. And it's how the mark appears to the consumer that's incredibly important. Thank you, counsel. Thank you, Your Honors. Just quickly on that similarity point before I move back into something else. What we note in our brief and what the court needs to focus on is, in addition to dealing with the similarities and differences, just in general the overall appearance of the two marks, you have to consider what aspects of each product are being used for branding purposes. And we put in the findings of the fact by the district court where, for instance, the different colored tops on the defendant's bottles were not being used for branding purposes and different colored tops were used by many types of flavored vodkas to show the different flavors. So you have to look at what aspect of the two products is being used for branding purposes. If you look at these two products side by side, the thing that jumps out at you on both of them is in the middle of the front label there is that lip logo that changes color with the flavors. These are the only two companies who have that on their vodka lines, so that's key. Also, Your Honor, going back to the statement counsel made about finding that the district court made about timing of branding stopping, I would note her findings were inconsistent in that regard. At one, the first volume of the excerpts of record, page 8, paragraph 22, the judge found, quote, consumers technically were still able to purchase Johnny Love Vodka at the time of trial. And then going back to the intent factor, Your Honors, your point was correct as to a couple things. One, we're not just talking about actual knowledge of another company's marketing out there. Constructive knowledge is part of the test as well. As soon as Johnny Love Vodka, as soon as the owner of the company registered the marks with the USPTO, everybody in the world was on constructive notice, including the bean companies. And when their attorneys did searching to see if there were any marks out there that were conflicting, those registrations existed. Their attorneys found them. So that is constructive knowledge right there. And based on that alone, if you look at the boldface licensing case, which is an incredibly close fact pattern in terms of intent, the court noted that as soon as the registration was in place, any other company had constructive knowledge. And the intent factor should have favored JL Beverage in connection with that factor. What do you think the date is that we start considering the launch of the product? Is it when they start making it or when they start selling it, or do we have a case that tells us? In terms of adoption of the mark? Yeah. Technically, Your Honor, adoption of the mark is when the mark is used in commerce, either by way of sales or marketing. So you guys disagree about that because he says it's when we started making the bottles. I disagree. Yeah. I mean, ultimately, again, this is a test that goes to consumers receiving some exposure to the mark. So it's when it's marketing or sales go to the public. That's adoption of the mark. Your Honor, quickly, I do want to talk about the – Was there advertising, so marketing before the actual sales in this case? So would that help him? I believe they rolled out marketing and sales essentially simultaneously, but I frankly don't know that exactly, Your Honor. I do have less than a minute, but I wanted to briefly, if the Court doesn't mind, talk about the issue of the district court striking the demand for jury trial. And I do want to point out, I would point the Court to, in the Sid and Marty Croft case, the Court relied both upon Dairy Queen and also the Fifth Circuit Swofford case, and the analysis – there's a large quote in the Sid and Marty Croft case along those lines, and I would ask the Court to look at that because the Court did, in Sid and Marty Croft, talk about a claim for an accounting of profits in connection with – they paralleled to Dairy Queen, which is a trademark case. And if you look at the analysis in Swofford and Sid and Marty Croft, I do think we have a conflict between prior Ninth Circuit decisions in Sid and Marty Croft versus in the 56 Hope Road case. Unless the Court has any questions. Counsel, ordinarily in your reserve time is to respond. We don't allow, usually, new issues to be asserted then because your opposition doesn't get a chance to do it. But just for your future. Thank you. If the panel has any more questions. Thank you, both sides, for the helpful arguments. The case is submitted and we're adjourned. All rise. The support for this session stands adjourned.
judges: Wallace, Friedland, Lasnik